DALLAS COUNTY HOSPITAL, *Employer*,
Virginia Reciprocal Exchange, *Carrier*
*v.* Judy DANIELS

CA 00-1403                                          47 S.W.3d 283

Court of Appeals of Arkansas
Division III
Opinion delivered June 13, 2001

*Bridges, Young, Matthews & Drake PLC,* by: *Michael J. Dennis,* for appellants.

*Compton, Prewett, Thomas & Hickey, P.A.,* by: *Floyd M. Thomas, Jr.,* for appellee.

WENDELL L. GRIFFEN, Judge. Dallas County Hospital, appellant employer, and Virginia Reciprocal Exchange, its workers' compensation insurance carrier, appeal a decision by the Workers' Compensation Commission that found appellee Judy Daniels was entitled to an open-ended award of temporary total disability benefits and that the performance of an intradiscal electrothermal treatment (IDET) was reasonably necessary to treat appellee's compensable back injury. Appellants argue that the Commission's decision is clearly erroneous. We hold under the substantial evidence standard of review, the Commission's decision is supported by substantial evidence. Therefore, we affirm.

The parties agree that on April 24, 1998, appellee sustained a compensable injury to her back while performing housekeeping duties in the employ of Dallas County Hospital. Appellee received temporary-total-disability benefits until October 31, 1998, when her employer contended that she had reached maximum medical benefit and that all appropriate benefits were paid. A hearing was held before an administrative law judge (ALJ), who was asked to consider 1) whether appellee was entitled to an open award of temporary-total-disability benefits as of November 1, 1998, 2) whether a referral to Dr. John Wilson was warranted, and 3) whether appellee should undergo an IDET procedure.

At the hearing, appellee testified that she injured her back as she picked up a chair while waxing floors for the employer. Prior to this incident, she had not experienced any back problems. Appellee reported the injury to her supervisor, who sent her to lie on a heating pad. The next morning, her supervisor sent her to Dr. Hugh Nutt, a general practitioner. During the next two years, appellee received treatment from Drs. Nutt, Simpson, Safman and Hart. Dr. Nutt initially told appellee to stay off her feet. However, due to appellee's increased pain, Dr. Nutt admitted her into Dallas County Hospital, where he ran CAT scans and administered pain medication. Dr. Nutt referred appellee to Dr. Simpson, who hospitalized her in Jefferson Regional for a day. Dr. Simpson subsequently treated appellee by giving her pain medication and muscle relaxers. He then sent appellee to Dr. Nutt, who took her off work

and placed her back in the hospital. Appellee was next sent to pain clinics and seen by Dr. Safman, who sent her back to work.

Dr. Nutt eventually referred appellee to the Little Rock Pain Clinic and Dr. Thomas Hart, who recommended that she undergo an IDET procedure. She testified that she was willing to undergo the procedure because she had not been able to work and was in pain on a daily basis. On cross-examination, appellee stated that she had also seen Dr. Lipke, an orthopaedic surgeon who referred her to Dr. Wilson. She stated she had not seen Dr. Wilson. Appellee testified she had three MRIs, three CAT scans, a discogram, a myelogram, and an electro-nerve study.

Although appellee attempted to return to work twice, she was not successful. She stated that her back had not stopped hurting since her injury although she had sought treatment from various physicians, taken different pain medications, wore a back brace, and had a TENS unit. Appellee testified that the persistent pain in her back resulted in her inability to work, and that she currently sought treatment from Dr. Hart as her budget permitted.

Various medical notes were also introduced. The first medical evidence, the results of a CT scan ordered by Dr. Nutt and dated March 30, 1998, indicated "spinal stenosis L4-5 with mild posterior disc herniation, more marked on the left side and ligamentum flavum hypertrophy." The scan also showed a bulging disc at L5-S1 that was present but not significant. Next, an MRI, which was ordered by Dr. Simpson on April 1, 1998, demonstrated no abnormalities. At the direction of Dr. Simpson, appellee underwent physical therapy, which was not effective. Dr. Simpson then ordered a myleogram and post-myelogram CT scan, which were performed on May 12, 1998, and revealed a "mild symmetrical bulging of the L4 disc with a component extending into the foramen on the left." On May 18, 1998, appellee was released by Dr. Simpson to return to Dr. Nutt, who hospitalized her on July 28, 1998, after determining that appellee had severe back pain that was not controllable through medication. Dr. Nutt also indicated in his notes that appellee had a partially ruptured disc.

Appellee was next examined by Dr. Richard Peek on August 4, 1998, who recommended conservative treatment in the form of physical therapy, lumbar epidural steroid injections, and oral medications. Dr. Peek also diagnosed appellee with 1) lumbar annular tear, 2) left-sided sciatica, and 3) bulging disc, L4-5, left. She was next examined by Dr. Bruce Safman on September 19, 1998, and

she reported no improvement. Because a previously administered injection was not effective, appellee visited the emergency room for treatment. Afterward, Dr. Safman changed appellee's medication and prescribed Prozac for her pain. Appellee returned to the emergency room, and Dr. Safman readjusted her medication after she informed him that she was experiencing headaches. On November 2, appellee went to visit Dr. Safman and reported that she had visited the emergency room on two separate occasions. However, Dr. Safman determined that appellee had reached maximum medical improvement and released her without restrictions.

On November 4, 1998, appellee was admitted to the hospital after visiting the emergency room for back pain. After receiving conservative treatment, she was released on November 8, 1998. Appellee was next seen by Dr. Lipke, who reported to appellants the results of a CT scan that demonstrated a left sided herniation at 4-5 and mild stenosis. Dr. Lipke also noted in a March 30, 1999, report that appellee had been unable to work since the injury as a result of the failure of conservative measures. Dr. Lipke referred appellee to Dr. Wilson for further evaluation and additional medical treatment. Although appellants approved the referral, an appointment was not scheduled. Appellee was next evaluated on July 7, 1999, by Dr. Thomas Hart, who observed that past treatments were not successful and recommended discography to determine the source of appellee's pain and if there was internal disc disruption. Dr. Hart performed the discography on September 9, 1999, and recommended IDET based on the test results.

The ALJ also received into evidence the deposition testimony of Drs. Simpson and Hart. Both physicians testified about discography and intradiscal electrothermal therapy. Dr. Simpson, a neurosurgeon, testified that he had not examined appellee since May 18, 1998, and characterized discography as "worthless," and IDET as "hocus-pocus." Dr. Simpson testified that he was not aware of any peer-reviewed studies that have occurred that indicate heating a disc will repair an annular tear, and that in his opinion, heating up a disc will absolutely not repair an annular tear. He also stated that he had not seen any peer-reviewed study or randomized peer-reviewed studies of IDET that would indicate that IDET is beneficial. Dr. Simpson testified that ninety-percent of his practice was spine surgery and that he kept up with literature dealing with treatment of the spine. He opined that appellee did not need an operation on any discs in her back. On cross-examination, Dr. Simpson acknowledged that he had not attended an American Association of Neurological Surgeons meeting within the last year.

· In his deposition testimony, Dr. Hart testified his sub-specialty was pain management and that he was board certified in pain management. Hart testified that IDET was a new technology that had come out within the last two years. He stated that IDET was FDA approved, had a seventy percent national success rating, and consisted of a minor outpatient non-surgical procedure. Hart testified that he had performed approximately eighty IDET procedures. He also testified that appellee had circumferential disruption on her disc, and that taking out a portion from the back part of the disc might help alleviate her pain. Hart testified that the procedure was reasonable and that there was a good chance that appellee would receive improvement.

The ALJ found that appellee was entitled to an open-ended award of temporary-total-disability benefits beginning on November 1, 1998 and that appellee proved entitlement to a referral to Dr. Wilson. However, the ALJ denied appellee's request for an IDET procedure. Both parties appealed the ALJ's decision to the Commission, who reviewed the record *de novo*. The Commission agreed with the ALJ's findings regarding the open-ended award of temporary-total-disability benefits and the referral to Dr. Wilson. However, it found that appellee proved that the IDET was reasonably necessary for the treatment of her compensable back injury. This appeal follows.[1]

*Standard of Review*

When considering whether the evidence is sufficient to support the Commission's conclusion, we view all evidence and reasonable inferences in a light most favorable toward the Commission's decision. *See Ester v. National Home Ctrs., Inc.*, 335 Ark. 356, 981 S.W.2d 91 (1998). The decision is affirmed when it is supported by substantial evidence, *i.e.*, when reasonable minds viewing the same evidence as presented to the Commission could reach the same conclusion as the Commission. *See id.* The critical question is not whether we might have concluded differently than the Commission or whether the evidence supports a different finding. *See Barnett v. Natural Gas Pipeline Co.*, 62 Ark. App. 265, 970 S.W.2d 319 (1998). Rather, the question remains whether reasonable minds

---

[1] Although appellants challenge the Commission's decision regarding appellee's entitlement to temporary total disability benefits and electro thermal therapy on appeal, it does not refute the Commission's decision that appellee is entitled to a referral to Dr. Wilson.

could arrive at the Commission's conclusion. *See id.* at 268, 970 S.W.2d 321. When the answer is yes, we affirm. *See id.*

*Entitlement to Temporary Total
Disability Benefits*

■■ Temporary total disability represents that interval of time within the healing period in which a claimant suffers a complete inability to earn wages. *See Georgia-Pacific Corp. v. Carter,* 62 Ark. App. 162, 969 S.W.2d 677 (1998). The healing period is statutorily defined as "that period for healing of an injury resulting from an accident." *See* Ark. Code Ann. § 11-9-102(13) (Supp. 1998). We have interpreted this period as including the time until the employee is as far restored as the permanent character of the injury will permit. *See Roberson v. Waste Management,* 58 Ark. App. 11, 944 S.W.2d 858 (1997). Once the underlying condition is more stable and will not improve with further treatment, the healing period is over. *See id.* Whether a claimant's healing period has ended is a factual question that is resolved by the Commission. *See id.*

In the present case, appellants argue that appellee was not diagnosed with disc herniation until after November 2, 1998, when Dr. Safman indicated that appellee had reached maximum medical improvement. The record clearly indicates that appellee was diagnosed with spinal stenosis at L4-5, with mild posterior disc herniation[2] as early as March 30, 1998. She was also diagnosed by Dr. Nutt on July 28, 1998, with acute, severe back pain secondary to a partially ruptured disc. This diagnosis was echoed by Dr. Lipke in his medical note, dated March 30, 1999, which indicated that a CT of appellee's lumbar spine showed a left sided herniation at L4-5 and mild spinal stenosis. Further, in a medical note dated October 1, 1999, Dr. Hart stated "post CT imaging after the [discography] procedure also demonstrated at L4-5 and L5-S1 levels, disc degeneration with posterior annular tears. A small central herniation at both levels, for L4-5 and L5-S1."

The record also does not support appellants' assertion that Dr. Lipke's March 30, 1999, medical record "does not address appellee's work status." Indeed, Dr. Lipke plainly states in the March 30,

---

[2] A herniated disc is described as protrusion of the nucleus pulposus or annulus fibrosus of the disk, which may impinge on nerve roots. It is also described as one that has protruded and then ruptured. *See Sloane-Dorland Annotated Medical-Legal Dictionary,* 344 (1987).

1999, medical record "she's been unable to work since the time of injury, although several attempts have been made for her to return to work."

■ Of the many physicians who treated appellee, only Dr. Safman determined that she had reached maximum medical improvement. It is significant that Dr. Safman made this determination on November 2, 1998, and two days later appellee was admitted into the hospital for treatment. Based on the foregoing, fair-minded individuals could agree with the Commission's finding that appellee was still within her healing period and entitled to an award of temporary total disability benefits beginning on November 1, 1998.

### Entitlement to IDET Procedure

■ We recently considered intradiscal electrothermal treatment (IDET) in *White Consol. Indus. v. Galloway*, 74 Ark. App. 13, 45 S.W.3d 396 (2001). In *Galloway*, the employer argued that IDET was experimental and not reasonably necessary to treat Galloway's back condition. After a *de novo* review, the Commission disagreed and found that the procedure was reasonable and necessary. On appeal, we agreed with the Commission, noting that whether a procedure is a reasonably necessary medical treatment is an issue for the Commission to resolve. *See Galloway, supra.* After recognizing that an employee is not required to prove a one-hundred percent success rate in order for a procedure to be considered reasonably necessary, we affirmed the Commission. *See Galloway, supra.*

■ ■ Here, substantial evidence exists to support the Commission's finding that appellee met her burden of proving that the IDET procedure was reasonably necessary to treat her compensable back injury. In its opinion, the Commission noted that it was aware of IDET and that, while the procedure was relatively new, the procedure was not experimental. Although appellants urge that the Commission mischaracterized Dr. Simpson's testimony as based on a limited amount of information, the record demonstrates that Dr. Simpson testified that he had read "what little literature that has passed before me." The Commission contrasted Simpson's testimony with that of Dr. Hart, who had performed roughly eighty IDET procedures and testified that the procedure, which was pioneered in 1997, was FDA approved and had a national success rate of seventy percent. It specifically stated that it gave significant weight to Dr. Hart's testimony because of Hart's experience in

performing IDETs and because Hart articulated sound reasons for his recommendation that appellee was a likely candidate, including the ineffectiveness of conservative treatment and appellee's inability to tolerate constant pain. Credibility issues, as well as the weight to give conflicting medical testimony, are factual determinations for the Commission to resolve. Based on our standard of review, we hold that the Commission's finding that the IDET procedure was reasonable and necessary is supported by substantial evidence. Accordingly, we affirm.

Affirmed.

ROBBINS and CRABTREE, JJ., agree.